# SUN INSURANCE CO. *v.* KOUNTZ LINE.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF LOUISIANA.

Argued January 17, 18, 1887. — Decided May 23, 1887.

A person who conducts himself with reference to the general public in such a way as to induce others, acting with reasonable caution, to believe that he is a partner in a partnership, is liable as such to a creditor of the partnership who contracted with it under such belief, although he is not in fact a partner.

The defendants in error so conducted themselves towards the general public, in their business relations with each other, as to induce a shipper,

acting with reasonable caution, to believe that they had formed a combination in the nature of a partnership, or were engaged as joint traders, under the name of the Kountz Line.

This was a libel in admiralty and *in personam*. The libellants were insurance companies, which issued policies covering certain produce and merchandise delivered, May 21, 1880, on board the steamboat Henry C. Yeager, at St. Louis, Missouri, for transportation to the city of New Orleans and other ports on the Mississippi River; which cargo was lost by the sinking of the boat the day succeeding its departure, from St. Louis. The Yeager was unseaworthy, both at the commencement of her voyage and at the time of the loss. The sinking and the loss were the direct consequence of such unseaworthiness.

The libellants having paid to the owners of the cargo the damages sustained by them — $31,720.10 — and having been subrogated to all the rights and claims of the latter on account of such loss, brought this suit against the appellees jointly to recover the amount so paid. In the District Court, the attachments sued out by the libellants were discharged, and the libel dismiss d. In the Circuit Court, it was adjudged that there was no joint liability on the part of the respondents, or any of them, and that liability for the loss of the cargo was alone upon the Yeager, and her owner, The H. C. Yeager Transportation Company. As to all the other respondents, the libel was dismissed. Of that decree the libellants complained, the principal assignment of error being that the court erred in not holding the respondents, or some of them, jointly liable for the loss of the cargo.

The general ground upon which this contention was placed was that the shipment of May 21, 1880, on the Henry C. Yeager was a part of the general business of transportation, in which The H. C. Yeager Transportation Company, The C. V. Kountz Transportation Company, The K. P. Kountz Transportation Company, and The M. Moore Transportation Company, were jointly engaged under the name of the "Kountz Line," and, consequently, that said companies were jointly liable for the loss and damages in question. The de-

cree below proceeded upon the ground that said companies were not jointly engaged in business, and that the loss must be borne entirely by the company owning the Henry C. Yeager. *Citizens' Ins. Co.* v. *The Kountz Line*, 4 Woods, 268.

The determination of the question of joint liability depended upon the facts set out in the finding by the Circuit Court. Those facts — preserving, in the statement of them by this court, substantially, the language of the court below — were as follows:

In June, 1872, William J. Kountz, John W. King, W. W. Atex, and Charles Scudder organized, under the laws of Missouri, a corporation by the name of the Kountz Line, of which they were to be, and did become, directors for the first year; and of which Kountz was president and King general agent. Its capital stock was fixed at fifteen thousand dollars, divided into shares of one hundred dollars each. The declared object of the corporation was to build or purchase, use or employ, one or more wharf-boats for the use of steamboats and other vessels belonging to the stockholders of the company; to build, purchase, or charter steamboats, towboats, etc., for transporting freight and passengers on the Mississippi River and its tributaries; and do a general river business. It does not appear that the Kountz Line corporation owned, at the time of the shipment on the Yeager, or at any time during the year 1880, any steamboat or other water craft, except a wharf-boat at St. Louis.

In a few months after the organization of that corporation, to wit, on the 13th of November, 1872, Kountz, King, and one Sheble organized, under the laws of Missouri, the four transportation companies above named, of each of which Kountz and King were chosen directors, and King treasurer and secretary. Kountz, King, and Sheble, Charles H. Seaman, H. K. Haslitt, and W. P. Braithwaite, having interests, as owners, respectively, in the steamboats Henry C. Yeager, Carrie V. Kountz, Katie P. Kountz, and Mollie Moore, transferred the same, by bills of sale, as follows: The Henry C. Yeager, to The H. C. Yeager Transportation Company; the Carrie V. Kountz, to The Carrie V. Kountz Transportation

Company; the Katie P. Kountz, to The K. P. Kountz Transportation Company; and the Mollie Moore, to The M. Moore Transportation Company; the vendors receiving, in consideration of said transfers, stock in the respective transportation companies.

Of the stock of the Kountz Line corporation, on the 6th of July, 1874, William J. Kountz owned two shares; King, D. C. Brady, Van Hook, and C. H. Seaman, one share each; the steamboats John F. Tolle, Henry C. Yeager, Mollie Moore, and Carrie V. Kountz, thirty-six shares each. There was no change in the ownership of such stock by those steamboats up to the commencement of this suit, except that the shares held by the John F. Tolle belonged to the steamboat J. B. M. Kehlor, when, on September 14, 1878, the latter was transferred to The M. Moore Transportation Company. W. J. Kountz never, at any time, owned more than two shares in the Kountz Line corporation, and was a stockholder in all of the transportation companies.

On the 15th of January, 1873, W. J. Kountz owned 398 shares, and King and Sheble each one share of the stock of The M. Moore Transportation Company. But, on December 19, 1879, the stock of that company was held as follows: Katie P. Kountz, a daughter of W. J. Kountz, 397 shares, and Kountz, King, and Rogers each one share. November 4, 1878, Katie P. Kountz held 241¾ shares, her father and King each one share, and Braithwaite 56¼ shares, in The K. P. Kountz Transportation Company. December 19, 1879, Katie P. Kountz held 379 shares, and her father, King, and Rogers each one share in The H. C. Yeager Transportation Company. On the 21st of May, 1880, of the stock of The C. V. Kountz Transportation Company, Katie P. Kountz held 323 shares; Clement Seaman 74 shares; and her father, King, and C. H. Seaman each one share. No subsequent transfers of stock in any of these companies were made, and, at the time of the shipment on the Yeager, "the stock in no two of said companies was held by the same person."

It thus appears that, at the time of the shipment on the Yeager, almost all the stock of these transportation companies stood in the name of a daughter of William J. Kountz.

It was further found by the court below, that the steamboats Carrie V. Kountz, Katie P. Kountz, Henry C. Yeager, and Mollie Moore "were employed by the respective transportation companies, to which they were conveyed, under the direction of the officers of said companies, in carrying freight and passengers on the Mississippi and its tributaries," the Kountz Line corporation being the "common agent" of said companies, and charging the latter "for the services rendered to them respectively, from one hundred to one hundred and fifty dollars per trip." Its office, as well as the business offices of the transportation companies, was in the same room on its wharf-boat at St. Louis. It — the Kountz Line corporation — collected the dues of the transportation companies, keeping a separate account with each, and paying to each the earnings of its own steamboat. By means of advertisements in newspapers, placards, hand bills, and cards, the Kountz Line corporation advertised the "Kountz Line," setting forth the advantages offered by the boats of that line, their low rates of freight, &c., and "announced that it was ready to contract for the carrying of goods and passengers by the Kountz Line boats." In those advertisements, placards, and hand bills, usually one, but sometimes two or more of the boats belonging to the transportation companies were mentioned "as belonging to said Kountz Line." The Kountz Line corporation made out bills of freight upon blanks headed "Kountz Line, St. Louis and New Orleans Packet," the bills being "in the name of the particular steamboat to which the freight was due, and the dray tickets of shippers indicating on what boat the goods were to be shipped." The bills of lading were usually signed "John W. King, ag't Kountz Line, St. Louis," the signature thereto being made by a stamp; but the bills were sometimes signed by the clerk of the steamboat on which the goods were shipped. Some of the ¹ ls of lading for the produce and merchandise shipped May 21, 1880, on the Yeager, recited "that the same were received from John W. King on board the steamboat Henry C. Yeager, to be delivered to the consignee at New Orleans. In witness whereof, the master, clerk, or agent of said boat

hath affirmed to three bills of lading," &c., and were signed, some of them, "John W. King, ag't Kountz Line, St. Louis," and some by E. B. McPherson, clerk. Others of said bills of lading recited the shipping of produce by other shippers on board the Henry C. Yeager, and were signed by King in the manner aforesaid, and others by E. B. McPherson, clerk.

In order that the boats belonging to said transportation companies might have freight, the Kountz Line corporation sometimes purchased produce and merchandise for the purpose of its being shipped upon them, the sum paid for such produce and merchandise being charged to the particular company in whose interest the purchase was made. The goods so purchased were usually bought and paid for by the Kountz Line corporation. Against such shipments it made drafts, in its own name, on the consignees. All moneys, whether received for freight carried by said several steamboats or for goods shipped and sold for their account, were remitted to Wm. J. Kountz or John W. King, as the agents of said Kountz Line, the cost of the goods being charged to the individual boat on which they were shipped. After deducting costs and charges, the net proceeds, although "deposited in bank to the credit of said Kountz Line, were placed in the books of account to the credit of the boat carrying the goods, and were her separate profits."

The Circuit Court found that the Kountz Line and the said transportation companies "owned no property in common," and that "there was no community of profits or property between said companies, including the Kountz Line, or any two or more of them." But it also found that "none of said steamboats were ever advertised by the name of the corporations that owned them," and that from the date of the incorporation of said transportation companies to the date of the said shipment on the Henry C. Yeager, "none of said transportation companies ever transacted any commercial business by their several and respective names, but the same was done by the name of the Kountz Line, or in the name of the individual boats belonging to said transportation companies."

Such, in substance, was the case made by the finding of facts.

*Mr. John A. Campbell* and *Mr. O. B. Sansum* for appellants.

*Mr. Charles B. Singleton* and *Mr. Richard· H. Browne* for appellees.

The question presented is : Did the District and Circuit Courts err, in refusing to hold these defendants jointly liable?

Let us take the great authority; Lindley, as to the kind of evidence to establish and prove the existence of an alleged or quasi-partnership, for no other sort is alleged as to these defendants.

The first is agreements in writing, and deeds showing the right to share profits.

*Admissions*, such as : advertisements, prospectuses, &c., containing the names of the alleged partners, and names over doors and on carts; Answers in chancery containing admissions; Bills, circulars, invoices, containing the names of the alleged partners; Bills of Exchange, drafts of agreements, letters and memoranda, showing an intention to give a share of profits, coupled with evidence that such intention was acted on. In what particular do the findings of the court bring this cause within the meaning and spirit of the evidence here required?

There was no division of profits. This cannot be maintained, even as to the earnings of the Kountz Line, for no lawyer has ever been absurd enough to claim that the profits divided among the shareholders of a corporation, according to the shares each held, made any sort of partnership between them.

There was no admission found by the court, either parol or in writing. The advertisements did not name these various transportation companies; only the boats which were the property of the respective companies were named.

Was anybody misled or deceived by supposing that these boats were partners? The earnings of each were credited to each, and none of the others shared in them. The Kountz Line had earnings. Its stockholders got them. If any boat made earnings, they belonged to her (or the transportation company which owned her) alone.

There are a number of English cases which overrule the general principle laid down in *Waugh* v. *Carver*, 2 H. Bl. 235. In *Cox* v. *Hickman*, 8 H. L. Cas. 268, the case of *Waugh* v. *Carver* was questioned, and the *ratio decidendi* in that case establishes that it does not contain a correct statement of the law of England. The learned editor of the 5th edition of Story on Partnership, § 47, note 2, referring to *Waugh* v. *Carver*, declares that the doctrine of that case, after being disapproved by all text writers, reluctantly followed by courts, and broken in upon by "subtle exceptions and limitations, has been finally overthrown in England," . . . and adds, "perhaps there is no other instance in commercial law where so many confessedly hard decisions have been based on so obvious a fallacy."

Lindley, in commenting upon the recent decisions *Holme* v. *Hammond*, L. R. 7, Ex. 218; *Mollwo, March & Co.* v. *Court of Wards*, L. R. 4, P. C. 419, and others, says, at page 42, ed. of 1881, "the strong tendency of the above decisions is to establish the doctrine that no person who does not hold himself out as a partner is liable to third persons for the acts of persons whose profits he shares, unless he and they are really partners *inter se;* and it is, perhaps, not going too far to say that this is now the law."

But the libellants may say, we admit there was no joint property, no joint fund, no joint losses, no joint profits, no arrangement to share loss or profit, yet you held yourselves out as partners in this carrying trade, and therefore you are jointly liable as you had a common agent, a common office, and employed these boats as the Kountz Line.

Now, the Kountz Line was simply the name of the agent of all these transportation companies or boats. It was a corporate body and had a corporate name, and took no part in the business carried on, except to do the business for each of the boats, keeping the accounts and profits of each separate and distinct. It was a designation.

It is true that Kountz and King were the president and secretary, respectively, of the Kountz Line, and were the officers likewise, when the loss occurred, of the several transportation

companies, but we know of no reason in law or morals why the same persons may not be the executive officers of two or more corporations at the same time, nor why the acts done by them for the benefit of one corporation should not enure solely to the benefit of that corporation, and not to the others. They did not represent the same interests, when they acted for the Kountz Line, as they did when they acted for the M. Moore Transportation Company, nor did they represent the H. C. Yeager Transportation Company when they bought goods to make freight for the K. P. Kountz Transportation Company, for the fact is found by the Circuit Court, that " the stock in no two of said companies was held by the same persons."

It seems a strange conclusion to say, that boats running under a common name, " Green Line," for example, although in a common trade, should be held to constitute a partnership, when their business was kept entirely distinct, as it was in this case.

There are cases very analogous to the one under consideration, though not entirely parallel in all respects; but they are so nearly the same, that they go far to sustain the District and Circuit Courts in their conclusions of law. See *Illinois Central Railroad* v. *Irwin*, 72 Ill. 452; *Briggs* v. *Vanderbilt*, 19 Barb. 222; *Bonsteel* v. *Vanderbilt*, 21 Barb. 26.

But we say, also, that there was no evidence offered in this cause, nor any finding to the effect, that the shippers of the goods insured, or the libellants who insured them, ever were misled by any representations of the Kountz Line, or any of these transportation companies.

There was not a scintilla of evidence to show that either or any of the shippers ever considered or were induced to believe that there was any partnership in the matter. There was not a word of testimony to show that there were any considerations inducing any one of them to ship on the Henry C. Yeager, because she was advertised as belonging to the Kountz Line. There was no support to the position that they were induced to ship, or trust, or rely upon the Kountz Line as a partnership, nor to show that any credit was given by them

on that account. Nor that these insurance companies ever insured on that account. It was a pure afterthought.

Besides, these shippers knew that they were shipping by a particular boat — the Henry C. Yeager. Their dray receipts showed this. In addition to that, their bills of lading showed what boat the goods were shipped on. Their insurance was on goods on a particular boat. Everything was patent to them, and to every one of them; that it was the steamboat Henry C. Yeager with which they were dealing; and we repeat that none of these libellants have ever indirectly shown that they were moved by such considerations, as are ingeniously suggested in the briefs on file.

What credits were given, what contracts made by these parties, upon the assumption that these boats constituted a partnership, or that the transportation companies were liable for the freight contracts made by each other, or by their boats, or the Kountz Line their agent?

Where a party holds himself out as a partner, and thereby procures credit upon the strength of his proposed relation, he is, on principles of natural justice, held to be such partner.

The transportation companies did not lend their names to the Kountz Line. They did not hold themselves out as partners in the Kountz Line. They obtained no credit upon the strength of such relation. Nor did the Kountz Line hold these transportation companies out as partners. Neither the names of the transportation companies, nor those of all the boats, were put on the advertisements, but simply one boat was usually advertised at any one time, as belonging to the Kountz Line, though sometimes two or more were.

The real ground on which liability is incurred by holding one's self out as a partner, is, that credit has been thereby obtained. 1 Lindley on Partnerships, 49, ed. of 1881. *Thompson* v. *Bank of Toledo*, 111 U. S. 529.

Lord Wensleydale, in *Dickinson* v. *Valpey*, 10 B. & C. 128, puts it with great clearness: "If it could have been proved that the defendant had held himself out to be a partner, not to the world, for that is a loose expression, but to the plaintiff himself, or under such circumstances of publicity as to satisfy

a jury that the plaintiff knew of it, and believed him to be a partner, he would be liable to the plaintiff in all transactions in which he engaged, and gave credit to the defendant, upon the faith of his being such partner."

The law, as declared in this country, is very clearly summed up in § 169 of Hutchison on Carriers ed. of 1879. See *City of Norwich*, 118 U. S. 468.

MR. JUSTICE HARLAN, after stating the case as above reported, delivered the opinion of the court.

It is not claimed that the four transportation companies, organized in 1872, can be held jointly liable for the loss of the produce and merchandise shipped on the Yeager by reason of their being, in fact, partners, having a right to participate in the profits of the business conducted by and in the name of the "Kountz Line." They did not share or agree to share the profits or to divide the losses of that business, as a unit. On the other hand, it is not disputed that, according to well settled principles of law, a person not a partner or joint trader may, under some circumstances, be held liable as if he were, in fact, a partner or joint trader. "Where the parties are not in reality partners," says Story, "but are held out to the world as such in transactions affecting third persons," they will be held to be partners as to such persons. Story's Part. § 64. And in Gow on Partnership (p. 4) it is laid down as an undeniable proposition, that "persons appearing ostensibly as joint traders are to be recognized and treated as partners, whatever may be the nature of the agreement under which they act, or whatever motive or inducement may prompt them to such an exhibition." And so it was adjudged in *Waugh* v. *Carver*, 2 H. Bl. 235, 246, where it was said by Lord Chief Justice Eyre, that if one will lend his name as a partner he becomes, as against all the world, a partner, "not upon the ground of the real transaction between them, but upon principles of general policy to prevent the frauds to which creditors would be liable." We do not mean to say that such liability exists in every case where the person sought to be charged

holds himself out as a partner or joint trader with others. The qualifications of the general rule are recognized in *Thompson* v. *First National Bank of Toledo*, 111 U. S. 529, 536, where it was held, upon full consideration, that "a person who is not in fact a partner, who has no interest in the business of the partnership, and does not share in its profits, and is sought to be charged for its debts because of having held himself out, or permitted himself to be held out, as a partner, cannot be made liable upon contracts of the partnership, except with those who have contracted with the partnership upon the faith of such partnership." At the same time, the court observed that there may be cases in which the holding out has been so public and so long continued as to justify the inference, as matter of fact, that one dealing with the partnership knew it and relied upon it, without direct testimony to that effect.

As there is no evidence of any direct representation by these transportation companies, or any of them, to the shippers of the cargo in question, as to their relations in business with each other, or as to their relations respectively with the Kountz Line corporation, or the Kountz Line, the inquiry in this case must be whether they so conducted themselves, with reference to the general public, as to induce a shipper, acting with reasonable caution, to believe that they had formed a combination in the nature of a partnership, or were engaged as joint traders, under the name of the Kountz Line.

In our judgment, this question must be answered in the affirmative. It could not, we think, be otherwise answered, consistently with the inferences which the facts reasonably justify.

The finding of facts, as we have seen, shows that the steamboats Henry C. Yeager, Katie P. Kountz, Carrie V. Kountz, and Mollie Moore were employed in the business of transporting freights and passengers on the Mississippi and its tributaries. They were placed by their owners, or were permitted by their owners to be placed, before the public as being engaged in the same trade, and as constituting, together, the "Kountz Line." They had a common agent, which was

invested with, or was permitted during a series of years to exercise, unlimited authority in their general management, and in respect to rates of transportation. That agent — the Kountz Line corporation — with the knowledge of the transportation companies, publicly announced that it was ready to contract for the carrying of goods and produce by the "Kountz Line boats." We say this was done with the knowledge of the owners of the boats, because the persons conducting the entire business of the Kountz Line boats were officers, with plenary authority of the transportation companies and of the Kountz Line corporation. The court below finds that the transportation companies used and employed their several boats in carrying freight and passengers on the Mississippi River and its tributaries. But with the intent, or with the effect, to mislead shippers, they took care, never, by their respective corporate names, to make, or to allow others in their behalf to make, any contracts, or to enter into any engagements, touching such business. It is expressly found that, during the whole period from the organization, on the same day, in the year 1872, to the date of the shipment on the Yeager in 1880 — a period of nearly eight years — they did not transact any commercial business whatever, by their respective corporate names. They severally empowered or permitted the Kountz Line corporation, their common agent, to do business for them, using, in their discretion, when making transportation contracts, either the name of the Kountz Line, composed of all the companies, or the names of the respective boats of that line. In no instance was business transacted by the Kountz Line corporation, *as representing the particular transportation company owning the boat on which the shipment was made.* Those companies, therefore, stood before the world as having united for the purpose of engaging, in the same trade, under the name and style of the Kountz Line, having a common agent — the Kountz Line corporation — fully authorized to represent them, and each of them, in respect to matters connected with such business. They held themselves out as united in a joint enterprise, under the name of the Kountz Line, and they are jointly

liable for the default or negligence of those placed in charge of any of the boats of that line. That the transportation companies owned no property in common, and that each was entitled, as between it and the others, to receive the net earnings of its own boat, is immaterial in view of the fact that they held themselves out, or permitted themselves to be held out, as jointly engaged in the business of transporting freights and passengers, in the same trade, on the Mississippi and its tributaries. So far as the public was concerned, that which was done by their common agent, the Kountz Line corporation, in the prosecution of the business of the several boats constituting the Kountz Line, is substantially what would have been done had the transportation companies entered into a formal agreement to conduct the transportation business, jointly, under the name of the "Kountz Line," through an agent having full authority to represent that line, and the several boats composing it, in the making of contracts with shippers. The latter had the right to infer, from all the circumstances, that the boats, constituting that line, were jointly engaged in such business.

As there is no serious conflict in the adjudged cases as to the general propositions of law to which we have referred, it would serve no useful purpose to review the authorities to which our attention is invited by counsel. Whether, in a particular case, there has been such a "holding out" as to create joint liability, must always depend upon its special facts. No one of the cases cited resembles the one before us in its facts.

This case seems to be unlike any found in the books in the peculiar relations existing between these transportation companies, the Kountz Line corporation, and the stockholders of each of them. We decide nothing more than that, under the facts of this case, The H. C. Yeager Transportation Company, The K. P. Kountz Transportation Company, The Carrie V. Kountz Transportation Company, and The M. Moore Transportation Company, were and are jointly liable for the loss of the produce and merchandise shipped May 21, 1880, on the steamboat Henry C. Yeager. The Circuit Court erred in not so adjudging.

*The decree is reversed, and the cause is remanded, with directions to that court to set aside all orders inconsistent with, and to enter such orders and decree as may be in conformity to, the principles of this opinion.*

MR. JUSTICE GRAY, not having heard the whole argument, took no part in this decision.

On the same day, (May 27, 1887,) on an application made on behalf of the plaintiff in error, the court ordered that the mandate in this case be stayed, and leave be granted to file a petition for a rehearing.